TIMOTHY J. MAXEY, APPELLANT, V. FREMONT DEPARTMENT OF UTILITIES, APPELLEE.

371 N.W.2d 294

Filed August 2, 1985. No. 84-606.

Thomas A. Grennan and John W. Iliff of Gross, Welch, Vinardi, Kauffman & Day, P.C., for appellant.

Dennis R. Riekenberg of Cassem, Tierney, Adams, Gotch & Douglas, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, HASTINGS, CAPORALE, SHANAHAN, and GRANT, JJ.

PER CURIAM.

Plaintiff has appealed from an order of the Nebraska Workmen's Compensation Court on rehearing which dismissed his claim for benefits allegedly arising out of an accident on May 15, 1980, because of the running of the 2-year statute of limitations.

Plaintiff assigns as errors: (1) The holding that the claim was barred by the statute of limitations; (2) The failure to hold that payment of medical expenses by the defendant-employer's health insurance carrier did not constitute payment of workmen's compensation benefits; (3) The holding that plaintiff's injury was not latent and progressive; and (4) The

holding that defendant was not estopped to interpose the statute of limitations as an affirmative defense.

Plaintiff was the only witness to testify as to the accident. He claimed that on May 15, 1980, while employed by the Fremont Department of Utilities, he was shutting an overhead door in a building owned by the defendant when the door came off the rails and struck his lower leg. He was taken to Dodge County Memorial Hospital and eventually, that same day, was examined by a Dr. Dillow. Plaintiff was off work all day Friday, May 16, as well as Monday, May 19, and returned to light duty on the 20th. It is his contention that two of his supervisors, Irv Hoerath and Bob Realph, urged him to return to work on May 20. Both of them deny this.

According to the deposition of Dr. Dillow, the complaints by plaintiff and the medical treatment did not include the knee because the "injury in question according to these notes was well below the knee." Dr. Dillow examined plaintiff but one time, and a claim was filed for his services with the workmen's compensation insurance carrier.

Generally, plaintiff's reasoning for not having filed claims with the workmen's compensation carrier for time he was off work and, later, for medical expenses was because both Irv Hoerath and Bob Realph told him he had to be off work 7 days before he would be entitled to pay under workmen's compensation. Such statements were denied by both of them.

However, according to the plaintiff's testimony, from the day he returned to work on May 20, 1980, until the end of 1982, he said he thought he was not qualified for workmen's compensation benefits even though the defendant never denied the claim.

Plaintiff testified that his knee continued to bother him throughout the months following the accident, and particularly after a day's work it would get worse and would swell. He had problems with his knee from May of 1980 through November of 1982, when he first consulted with an orthopedic surgeon, Dr. Brantigan, on November 8, 1982.

According to a diary which plaintiff prepared from his employment records, exhibit 26, he was off work in excess of 20 days from May 15, 1980, to May 15, 1982, all because of his

knee. He either took sick leave or vacation time and did not make claim for workmen's compensation benefits. During this same period of time, he was consulting with a Dr. Eaton and a chiropractor, Dr. Beach, on innumerable occasions, complaining, among other things, about his knee. Specifically, he first consulted with Dr. Beach on March 15, 1982, with a history of having fallen on an icy porch some 8 weeks earlier, injuring his back and knee. On October 31, 1981, he was examined by Dr. Eaton because of a bruise on the left knee.

According to the original history recited in Dr. Brantigan's report of November 8, 1982, plaintiff had had four surgical procedures on this particular knee in 1978 and 1979, including a partial arthroscopic meniscectomy, an open medial meniscectomy, and a patellar shaving procedure. Significant is the physician's statement that plaintiff suffered an accident $1\frac{1}{2}$ years earlier, causing extensive ecchymosis to the leg, but "does not think that this caused any damage to the knee itself."

Sometime the following summer, plaintiff wrote to Dr. Brantigan, advising him that he always did think his knee problem arose out of the accident, and Dr. Brantigan changed his report accordingly. Dr. Brantigan diagnosed plaintiff's problem as a probable cartilaginous loose body in the knee and did an arthroscopic examination which revealed a large tear in the lateral meniscus of the knee. It was his further diagnosis that plaintiff possessed an insufficiency of the anterior cruciate ligament that caused the knee joint to have rotary laxity, allowing the tear of the lateral meniscus to occur just prior to the time that plaintiff came to see Dr. Brantigan.

Following the bills for the initial treatment the day of the accident, all of the medical bills through August of 1983, totaling nearly $10,000, were turned in by the plaintiff on forms of the group health insurance carrier, on which he had indicated each time "not a work-related injury." He seems to justify this position on the original disputed statements of his superiors that he had to be off work more than 7 days to qualify for compensation benefits. In the same manner, and presumably for the same reason, when plaintiff would call in to report that he would not be at work, he would designate whether sick leave or vacation leave should apply.

The only "live" witness other than the plaintiff to testify was Jan Marie Rice, administrative secretary for the Fremont Department of Utilities. It was her testimony generally that the department would rely on the information provided by the employee as to whether to process an injury claim as workmen's compensation or health and accident.

In our review of this case we are guided by the principle that findings of fact made by the Nebraska Workmen's Compensation Court on rehearing have the same effect as a jury verdict in a civil case, and an order disposing of a case, whether it be to enter an award or cause a dismissal of the claim, may not be set aside where the findings are supported by the evidence. The facts are not reweighed on appeal. *Smith v. Fremont Contract Carriers*, 218 Neb. 652, 358 N.W.2d 211 (1984).

As previously stated, the accident in question occurred on May 15, 1980. Plaintiff's petition was filed in the compensation court on November 7, 1983. The final payment made by the workmen's compensation carrier, Aetna Insurance Company, was made on June 15, 1980. All other payments for medical services were made by defendant's health insurance carrier.

Neb. Rev. Stat. § 48-137 (Reissue 1984) provides that all claims for workmen's compensation benefits shall be forever barred unless a petition shall have been filed within 2 years of the accident or 2 years of the last payment of compensation benefits.

Therefore, unless the payments for medical services made by the health insurance carrier can be considered as payments of compensation benefits, or unless the injury was latent and progressive so as to toll the running of the statute of limitations, this claim is barred because of not having been filed within 2 years of June 15, 1980.

Plaintiff admits, by way of argument, that this court has not directly addressed the issue of medical payments under a health and accident plan as constituting payment of compensation, but argues that several of our cases suggest such a result. One such case is *Ashton v. Blue River Power Co.*, 117 Neb. 661, 222 N.W. 42 (1928). However, in that case the employer unquestionably made weekly compensation payments, but only

argued that they were for a different injury than that for which the employee was then claiming benefits. This court rejected that argument because "the district court evidently found to the contrary, and the evidence in the record supports that conclusion." *Id.* at 668, 222 N.W. at 45.

The employee next cites *Baade v. Omaha Flour Mills Co.*, 118 Neb. 445, 225 N.W. 117 (1929). We do not understand that opinion to hold that payment of medical expenses by a health and accident insurer tolls the statute of limitations. Rather, we believe, in the context of that case, that the payments were made by the compensation carrier, and this court was saying for the first time that payments of medical and hospital expenses "clearly constitute payments of compensation within the meaning of [the compensation law]." *Id.* at 448, 225 N.W. at 119.

Also relied on by the plaintiff is *Gourley v. City of Grand Island*, 168 Neb. 538, 96 N.W.2d 309 (1959), which, citing *Baade v. Omaha Flour Mills Co., supra*, held that providing of sick leave and treatment by the city physician constituted payment of compensation. However, in *Gourley* this court said: "Plaintiff went to the mayor and notified him of his accident and was ordered to go to the city physician, which he did. He was given 'sick leave' of one day on an application blank which recited that his condition resulted from his employment by the city." 168 Neb. at 539, 96 N.W.2d at 311.

We have no quarrel with a rule which provides that payments for time off or for medical treatment made in lieu of compensation benefits for an undisputed job-related injury constitute payment of compensation. However, in the instant case, other than the self-serving statements of the plaintiff himself some 3 years after the alleged accident, there is no competent evidence that the knee injury was ever claimed to be work related.

We agree with plaintiff that in *Novak v. Triangle Steel Co.*, 197 Neb. 783, 251 N.W.2d 158 (1977), which held that a mistake of law does not excuse a late filing, this court said: "When he entered the hospital in December 1973, Novak knew he had suffered a disabling injury. He related that injury to the accident of October 23, 1973. He accepted benefits from his

employer's group health carrier for hospitalization and surgical care between December 31, 1973, and January 17, 1974." *Id.* at 787, 251 N.W.2d at 161. We are not sure the premise supports the conclusion. We do not agree with plaintiff that such statement recognizes that payment of health insurance benefits with nothing more constitutes payment of compensation.

Plaintiff cites cases from other jurisdictions. *Elsas v. Montgomery Elevator Co.*, 330 Mo. 596, 50 S.W.2d 130 (1932); *Matter of Gould v. Champeney & Turk, Inc.*, 249 A.D. 911, 292 N.Y.S. 530 (1937); *Pizza Hut of San Diego, Inc. v. Workers' Comp. Appeals Bd.*, 76 Cal. App. 3d 818, 143 Cal. Rptr. 131 (1978). However, in *Elsas* there is no indication that the insurance company paying benefits was the compensation carrier or a group health carrier. The case turned on the fact that the company adjuster testified he did not make the payment under the compensation law but, rather, as a common-law claim, to which the court answered that no one had ever told the employee the theory upon which the payments were made. In the present case it was Maxey who in effect determined the nature of the payments.

*Gould* does not disclose otherwise than that the insurance carrier making payments may have been the compensation carrier. All that case stands for is that payments of medical benefits and for wages lost due to an industrial accident constitute payments of compensation.

In *Pizza Hut* the court held that the employer had prompt notice of the *industrial* accident and permitted the employee to receive company-provided insurance benefits, stressing that the employer took no action which would have given the employee notice that it was not furnishing benefits for the industrial accident. Again, we point out that it was Maxey, not the employer, who designated the claim as medical and non-job-related and assigned vacation or sick benefits to compensate him for work missed.

Finally, plaintiff points to *Girlish v Acme Precision Products*, 404 Mich. 371, 273 N.W.2d 62 (1978). In a 4-to-3 decision, the Michigan court did hold that voluntary payment of medical expense by an employer's group health policy of insurance constitutes a waiver of the 6-month notice

requirement.

On the other hand, it is apparent that the Nebraska Legislature intended to maintain the separate and distinct nature of benefits payable under the compensation act and benefits payable under other plans, whether sponsored by employee associations or employers under group health plans, when it enacted Neb. Rev. Stat. §§ 48-130 and 48-147 (Reissue 1984).

The first section provides in pertinent part as follows: "[N]or shall benefits derived from any other source than those paid or caused to be paid by the employer as herein provided, be considered in fixing compensation under this act." § 48-130.

The Legislature further separated the benefits payable under the act from other benefits to which an employee might be entitled when it enacted the following provision:

> Nothing in this act shall affect any existing contract for employer's liability insurance, or affect the organization of any mutual or other insurance company, or any arrangement existing between employers and employees, providing for payment to such employees, their families, dependents or representatives, sick, accident or death benefits in addition to the compensation provided for by this act; *but liability for compensation under this act shall not be reduced or affected by any insurance of the injured employee,* or any contribution or other benefit whatsoever, due to or received by the person entitled to such compensation . . . .

(Emphasis supplied.) § 48-147.

The express language used by the Nebraska Legislature in the preceding sections clearly reveals benefits secured by an injured employee from collateral sources are not to be considered in fixing compensation under the Workmen's Compensation Act, nor are they to affect liability for compensation to the injured employee. Appellant has requested this court to act contrary to this express language by asking the court to find benefits paid by collateral sources are "compensation" sufficient to toll the statute of limitations of the act. Such a contravention of the act's clear and express provisions is impermissible even under the "liberal construction" sought by appellant.

This court previously upheld the separate and distinct nature of the Workmen's Compensation Act and other benefit plans in *Shandy v. City of Omaha*, 127 Neb. 406, 413, 255 N.W. 477, 480 (1934), when it held that "payment of pensions to firemen or their dependents under the laws relating to metropolitan cities in no way affects the claims of such persons under the workmen's compensation act or their right to recover under the provisions thereof."

Although perhaps not directly on point, *Teague v. City of Omaha*, 211 Neb. 872, 320 N.W.2d 779 (1982), specifically held that payments in lieu of workmen's compensation made under a disability pension plan did not toll the period of limitations, and the city was not estopped from asserting that as a defense.

Expanding somewhat on *Pizza Hut of San Diego, Inc. v. Workers' Comp. Appeals Bd.*, 76 Cal. App. 3d 818, 143 Cal Rptr. 131 (1978), a decision by the California Supreme Court, *Kaiser Foundation Hospitals v. Workers' Comp. Appeals Bd.*, 19 Cal. 3d 329, 562 P.2d 1037, 137 Cal. Rptr. 878 (1977), suggests the underlying purpose of the tolling provisions of the law is to prevent a potential claimant from being misled by the employer's voluntary acts which reasonably indicate an acceptance of responsibility for the employee's injury. Any misleading in this case, if such be the fact, was done by the employee in requesting sick leave and vacation rather than compensation benefits, and reciting in connection with claims for medical payments that the injury was not job related.

As previously pointed out, *Matter of Gould v. Champeney & Turk, Inc.*, 249 A.D. 911, 292 N.Y.S. 530 (1937), did not indicate whether the medical payments were paid by a group health or a compensation carrier. However, in *Matter of Iovino v. Western Elec. Co.*, 71 A.D.2d 717, 419 N.Y.S.2d 210 (1979), without going into great detail, the New York court held that payment of wages and medical insurance benefits under an employee benefit plan did not constitute advance payment of compensation.

Another case from that jurisdiction, *Matter of Kaszas v. Monticello Cent. School*, 53 A.D.2d 940, 385 N.Y.S.2d 420 (1976), setting forth a rule similar to that of California, held that furnishing of medical care to an employee under a group

health plan would be considered as advance payment of compensation only when made under such circumstances as to imply knowledge of recognition of liability for compensation benefits.

In *Deabay v. St. Regis Paper Co.*, 442 A.2d 963 (Me. 1982), that court held, in interpreting a particular statute of that state, that payments made by a group health insurer were not made pursuant to the workmen's compensation laws but as required by union contract.

*Erwin v. Agrico Chemical Co. of Delaware*, 422 So. 2d 1385 (La. App. 1982), involved a similar situation in which the employee filled out claim forms indicating that her injury was not work related. Although holding that such a statement would not bar a claim where the employee later becomes aware of the injury's relationship to a work-related accident and notifies the employer, the court went on to state at 1387:

> In this case, however, the causal relation between plaintiff's work and her injury is not at issue. Rather, it is plaintiff's understanding as to the character of the payments she received, *at the time she received them*, that is at issue here. Because plaintiff did not connect the injury with her work at the time she signed the forms, nor did she subsequently notify her employer of any suspected connection, we can only conclude that she could not at that time have reasonably believed that these payments were compensation for a work-related injury, i.e., workmen's compensation.

> In addition, the record reveals that the trial judge, after having viewed the evidence and heard the testimony of all the witnesses, stated in his oral reasons for judgment that he simply did not believe that plaintiff thought the long term disability payments were workmen's compensation benefits.

We hold that payment of wages or reimbursement of medical expense by an employer under an employee benefit plan or group health insurance agreement does not constitute remuneration in lieu of workmen's compensation benefits so as to toll the statute of limitations, unless, by the conduct of the employer, it may reasonably be inferred that such payments

were made with an intent that payment constitute compensation and a conscious recognition of liability for compensation benefits on the part of the employer. *Rhola v. Wonder Bread*, 639 P.2d 1242 (Okla. 1982). See, also, *Chemstrand Company v. Enfinger*, 231 So. 2d 816 (Fla. 1970), to the effect that voluntary payment of wages or medical benefits does not toll the statute of limitations unless the employer is aware or should be aware that it constitutes payment of compensation for the injury.

Where an injury is latent and progressive, the statute of limitations is tolled until it becomes reasonably apparent, or should have become apparent· to the employee, that a compensable disability is present, and the burden of proving the latent and progressive nature of the injury is on the plaintiff-employee. *Ohnmacht v. Peter Kiewit Sons Co.*, 178 Neb. 741, 135 N.W.2d 237 (1965).

In his testimony plaintiff insists that his knee had bothered him on a weekly basis since the date of the accident and that he felt strongly that the accident was the cause of his difficulty. But he claims he did not know the full extent of his injury. However, knowledge that there is a compensable disability, and not awareness of the full extent thereof, is the factor which controls. *Seymour v. Journal-Star Printing Co.*, 174 Neb. 150, 116 N.W.2d 297 (1962).

Maxey cites *O'Connor v. Anderson Bros. Plumbing & Heating*, 207 Neb. 641, 300 N.W.2d 188 (1981), and *Borowski v. Armco Steel Corp.*, 188 Neb. 654, 198 N.W.2d 460 (1972), in support of his claim that his was a latent and progressive injury. However, as pointed out by this court in *Thomas v. Kayser-Roth Corp.*, 211 Neb. 704, 708-09, 320 N.W.2d 111, 114 (1982):

> In both the *O'Connor* case and the *Borowski* case, and cases of similar import where we have applied the latent exception, the evidence disclosed that indeed the initial accident was either trifling in nature or appeared to be healed and subsequently the injury began to get progressively worse. Specifically, in *Borowski* the employee was advised by the treating physician that while he suffered damages to the muscles of his upper leg and

that it would be a slow healing process, he should not be alarmed and would fully recover. After a period of months the pain subsided. Thereafter, when the pain reoccurred, he consulted a physician on seven occasions and was assured that his condition was normal. It was not until sometime later that he was referred to an orthopedic surgeon who performed a myelogram and discovered the herniated disc caused by the initial injury.

Likewise, in *O'Connor* the employee was initially injured in September of 1965 while laying a sewer line in a ditch. He received compensation for this injury and continued thereafter working. It was not until October of 1977, when operating a cigarette machine, that the employee's left arm went completely dead. From the time of the accident until the original award, plaintiff was examined or treated by five different doctors—a general practitioner, three orthopedic surgeons, and a neurologist—none of whom diagnosed his subsequent condition. He repeatedly consulted his personal physician and periodically received ultrasonic treatments and physiotherapy. He was advised by a treating physician: "It's all in your head. Go see a psychiatrist." It was not until the incident resulting in the complete disability of his left arm that the worker's condition was fully diagnosed following the administration of a myelogram.

We went on to say, in substance, that the mere fact that an employee did not know the full extent of his injury from a medical standpoint does not make it latent, particularly where the medical facts were reasonably discoverable.

Plaintiff claims he knew he was suffering from some disability, as witnessed by the many days off, but never once made claim for compensation even though by his own admission he knew he was eligible for payment after 7 days. Certainly he was aware of the need for medical treatment, which he sought, yet he never did claim to be entitled to compensation benefits for the particular injury.

As stated further in *Thomas, supra* at 710, 320 N.W.2d at 115: "Both the one-judge court and, again, the three-judge court found that the injury was not latent or progressive and

therefore not within the 'latent exception' to the statute of limitations. We are unable to say that the evidence does not amply support that conclusion."

Maxey's final contention, that the defendant-employer is estopped from asserting the statute of limitations defense because of false representations or concealment of material facts, may be disposed of on two grounds. First, the claimed representation by the employer that plaintiff was not entitled to compensation until he was off work for 7 days is entirely accurate. Secondly, that representation, and certainly plaintiff's claim that he was told to cover up the fact that his injury was work related, was denied by all involved. This was a purely factual question which was resolved by the compensation court, which resolution finds support in the record and will not be disturbed on appeal.

The judgment of the compensation court is affirmed.

AFFIRMED.